# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche Manning | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 98 C 6307 | **DATE** | 2/25/2000 |
| **CASE TITLE** | Faye Marie Elliott, et al. vs. Chicago Housing Authority, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation recommending that Plaintiff's Amended Motion for Class Certification [69-1] be granted is hereby submitted to Judge Manning.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| ✓ | Copy to judge/magistrate judge. | |

5+J
number of notices

FEB 28 2000
date docketed

docketing deputy initials

2/25/2000
date mailed notice

KMc
mailing deputy initials

courtroom deputy's initials KMc

Date/time received in central Clerk's Office

Document Number

120

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FAYE MARIE ELLIOTT, individually and as mother )
of Amanda Lisa Marie Elliott, Edward Elliott and )
David Boss, all minors, and PAMELA HALL, )
individually and as mother of Cecile Hall and Ieshia )
Hall, minors, MARY HALL, HELEN GREENLEE, )
individually and as mother of Brandon Greenlee, a )
minor, on behalf of themselves all others similarly )
situated, )

    Plaintiffs, )

v. )

CHICAGO HOUSING AUTHORITY, CHAC, INC., )
QUADEL CONSULTING CORPORATION, INC., a )
foreign corporation, and LUCIUS L. HOUSE, an )
individual, )

    Defendants. )

DOCKETED
FEB 2 8 2000

DOCKETED
FEB 2 8 2000

No. 98 C 6307

Hon. Blanche M. Manning

Magistrate Nan R. Nolan

To:    The Honorable Blanche M. Manning
       United States District Court Judge

## REPORT AND RECOMMENDATION

Nan R. Nolan, United States Magistrate Judge

    Plaintiffs Faye Marie Elliott, Pamela Hall, Mary Hall, and Helen Greenlee bring this putative

class action against Defendants Chicago Housing Authority ("CHA"), CHAC, Inc. ("CHAC"),

Quadel Consulting Corporation, Inc. ("Quadel"), and an individual owner of one of the properties

that is a subject of the complaint in order to redress alleged "pervasive and systemic violations" of

"the federal lead-based paint statutes and regulations for Section 8 housing by failing to inspect for

lead paint and defective paint, to enforce lead paint abatement in Section 8 Program properties, and

to notify Section 8 tenants of potential lead-based paint at Section 8 Program properties, thereby

*120*

causing lead-based paint poisoning and potential lead-based paint poisoning in tenants of Section 8 housing." Third Am. Class Cmplt. ¶¶ 2, 65. Plaintiffs seek: (1) mandatory injunctive relief requiring CHA, CHAC, and Quadel to comply with the federal lead-based paint regulations applicable to the Section 8 Existing Housing Program and (2) an order requiring CHA, CHAC, and Quadel to establish a fund to medically monitor children exposed to lead-based paint hazards as result of Defendants' alleged failure to comply with federal lead-based paint statues and regulations applicable to Section 8 housing. Id. ¶ 4. This matter is now before the Court on Plaintiffs' Amended Motion for Class Certification (#69). For the reasons explained below, Plaintiffs' Amended Motion for Class Certification should be GRANTED.

# I. FACTUAL BACKGROUND[1]

Plaintiffs seek class relief against CHA, CHAC, and Quadel. The CHA is a public body, corporate and politic, exercising its powers as an agency of the City of Chicago, organized and existing under the laws of the State of Illinois, and is located at 200 West Adams, Suite 2100, Chicago, Illinois 60606. Third Am. Class Cmplt. ¶ 17. Quadel is a Maryland corporation and the parent company of CHAC. Id. ¶ 18. In approximately December 1995, Quadel entered into a contract with the CHA to operate the CHA's Section 8 Program. Id.

CHAC is an Illinois corporation and a subsidiary of Quadel. Id. ¶ 19. CHAC was incorporated in November 1995 for the purpose of operating the CHA's Section 8 Program pursuant

---

[1] The following facts are taken from Plaintiffs' Third Amended Class Action Complaint and are taken as true for purposes of ruling on the motion for class certification. Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 598 (7th Cir. 1993) (indicating courts generally are not allowed to engage in an analysis of the merits in order to determine whether a class action may be maintained).

to the contract between Quadel and the CHA. Id. Since December 1995, CHAC has been responsible for administering and maintaining the CHA's Section 8 program, including but not limited to conducting initial and annual inspections of Section 8 properties. Id.

Faye Marie Elliott holds a Section 8 certificate and resides at 4041 W. Polk Street in Chicago, Illinois. Id. ¶ 7. Elliott brings this action individually and on behalf of her minor children, Amanda Lisa Marie Elliott (DOB 2/14/87), Edward Elliott (DOB 6/10/84), and David Boss (DOB 3/13/86). Id. ¶¶ 7-10. Effective August 1, 1991, Elliott received a Section 8 housing certification. Around that time, she submitted to the CHA a request for approval of an apartment located at 106 South Parkside in Chicago, Illinois for Section 8 subsidy payments. Id. ¶ 69. The CHA failed to perform the federally required initial inspection prior to its approval of the South Parkside unit as Section 8 housing and annual inspections thereafter. Id. ¶ 70. Defective paint surfaces existed at the time Elliott and her children moved into this apartment.1 Id. ¶ 71.

In September 1992, Amanda Elliott was found to be lead poisoned with a blood-lead level ("BLL") of 61 micrograms per deciliter of whole blood (mcg/dl). Inspections performed by the Chicago Department of Health ("CDOH") on September 21, 1992 and February 3, 1993 revealed the presence of lead-based paint hazards throughout the South Parkside apartment. Id. ¶ 72. In October 1992, David Elliott was tested with a BLL of 33.3 mcg/dl and Edward Elliott was tested with a BLL of 15 mcg/dl. Id. ¶ 73.

On August 29, 1996, CHAC performed an annual inspection of the South Parkside apartment for defective paint surfaces which disclosed substantial defective paint surfaces. Id. ¶ 74. The next day, CHAC sent two notices to the owner of the apartment building. Id. ¶ 75. One notice stated that the inspection revealed the existence of "emergency violations" of the Housing Quality Standards

("HQS"), which had to be repaired by the owner within 24 hours. Id. The other notice indicated that the inspection revealed additional violations of the Housing Quality Standards, which had to be repaired by September 29, 1996. Id. Defendants failed to verify whether the owner performed the required abatement. Id. ¶ 77.

CHAC next inspected the South Parkside apartment on April 25, 1997. This inspection disclosed that the lead paint violations had not been abated by the owner. Id. ¶ 78. On April 28, 1997, CHAC sent the owner a letter indicating that the Housing Assistance Payments would be stopped if he did not complete the required repairs within fifteen days. Id. CHAC and Quadel failed to terminate the Housing Assistance Payments Contract until February 1998, at which time the Elliott family moved out of their apartment and into another Section 8 property. Id. ¶ 79. The Elliott family continues to reside in Section 8 Program housing. Id. ¶ 80.

Pamela Hall also holds a Section 8 certificate. She resides at 5211 W. Augusta in Chicago, Illinois. Pamela Hall previously resided at 1022 South Menard in Chicago, Illinois. Id. ¶ 11. Hall brings this action individually and as parent and natural guardian of her minor children, Cecile Hall (DOB 9/30/88) and Ieshia Hall (DOB 5/6/94). Id. From approximately late 1990 through May 1992, Pamela Hall and her daughter Cecile lived in a Section 8 subsidized apartment leased by Pamela's mother at 5573 West Jackson in Chicago, Illinois. Id. ¶ 83. Lead-based paint hazards existed in this apartment throughout Pamela and Cecile's tenancy. Id. ¶ 84. During this time period, Cecile's blood lead levels tested as high as 53 mcg/dl. Id. ¶ 85. Cecile received chelation treatment to reduce her blood levels. Id.

In May 1992, Pamela Hall received a Section 8 voucher and submitted to the CHA a form for approval to move into an apartment located at 5803 West Erie in Chicago, Illinois. Id. ¶ 86.

-4-

Pamela Hall and her family continued to live in this apartment through July 1995. Id. CHA failed

to perform an initial inspection for defective paint surfaces prior to its approval of the West Erie

apartment as Section 8 housing, as well as annual inspections. Id. ¶ 87. In the months after moving

into the West Erie apartment, Cecile continued to have elevated blood-lead levels. Id. ¶ 88. In

March 1994, the CDOH inspected the apartment and found lead-based paint hazards, including

defective lead-based paint on chewable surfaces. Id. ¶ 89. A subsequent CDOH inspection revealed

the continued existence of several lead-based hazards throughout the unit. Id. ¶ 90. Between July

1995 and December 1997, Pamela Hall and her children lived in other Section 8 housing. Id. ¶ 92.

In approximately January 1998, Pamela, Cecile and Ieshia moved into a Section 8 subsidized

apartment located at 1022 South Menard in Chicago, Illinois. Id. ¶ 93. CHAC conducted an initial

inspection on or about November 4, 1997. Id. Peeling and flaking lead-based paint has existed in

the apartment since the beginning of Hall's tenancy. Id. Plaintiffs allege that CHA, Quadel, and

CHAC failed to inspect the apartment for defective paint surfaces and failed to require the owner to

abate the lead hazards. Id.

Mary Hall resides at 150 North Mason in Chicago, Illinois. Mary Hall is the Section 8

certificate holder of the apartment where Helen Greenlee and Brandon Greenlee reside. Id. ¶ 14.

Helen Greenlee brings this action individually and on behalf of her minor child, Brandon Greenlee

(DOB 10/2/97). Mary Hall received her Section 8 housing certificate in or around 1987. Id. ¶ 95.

In approximately 1994, Mary Hall sought approval from the CHA to move into the North Mason

apartment. Id. ¶ 96. CHA failed to conduct an initial inspection for defective paint surfaces in the

apartment but approved the unit for Section 8 subsidy payments. Id. Defective paint surfaces

existed in the apartment at the time Mary Hall and her daughter, Helen Greenlee, moved into the

unit. Id. ¶ 97. Additional defective paint surfaces developed thereafter. Id. On April 18, 1994, the

CDOH inspected the apartment and found pervasive lead-based paint hazards. Id. On October 2,

1997, Helen's son, Brandon, was born. Id. ¶ 98. Mary Hall and Helen and Brandon Greenlee

continue to live in the North Mason apartment. Id. Neither the CHA nor CHAC has performed an

inspection for defective paint surfaces. Id. ¶ 99.

Plaintiffs' complaint contains the following twelve counts: (1) class claim for injunctive

relief under 42 U.S.C. § 1983 against CHA; (2) class claim for injunctive relief under 42 U.S.C. §

1983 against CHAC and Quadel; (3) class claim for injunctive relief under an implied right of action

against CHA; (4) class claim for injunctive relief under an implied right of action against CHAC and

Quadel; (5) class claim for injunctive relief, third party beneficiary claim against CHA; (6) class

claim for injunctive relief, third party beneficiary against CHAC and Quadel; (7) class claim for

injunctive relief alleging negligence against CHAC and Quadel; (8) individual claim for damages

alleging negligence against CHAC and Quadel; (9) individual claim for damages under 42 U.S.C.

§ 1983 against CHA; (10) individual claim for damages alleging negligence against Lucius House;

(11) individual claim for damages alleging violation of Illinois Lead Poisoning Prevention Act

against Lucius House; and (12) individual claim for damages alleging violation of Chapter 5-12 of

the Chicago Municipal Code against Lucius House.

Plaintiffs seek certification of three sub-classes. Sub-class 1 is asserted on behalf of all

children under the age of six who presently or in the future will reside in Section 8 housing in

Chicago to which the lead-based paint housing quality standards apply and who have been or who

will be exposed to lead. Sub-class 1 seeks an injunction requiring Defendants to comply with the

governing laws and regulations relating to lead-based paint in Section 8 housing. Sub-class 2 is

asserted on behalf of children presently and in the past who resided in Section 8 housing in Chicago to which the lead-based paint housing quality standards apply. Sub-class 2 seeks the establishment of a court-supervised medical monitoring fund to pay for testing to detect the onset of lead poisoning. Sub-class 3 is brought on behalf of children who presently and in the past resided in Section 8 housing in Chicago to which the lead-based paint housing quality standards apply and who have been tested with elevated blood-lead levels in excess of 10 mcg/dl. Sub-class 3 seeks the establishment of a court-supervised medical monitoring fund that will pay for neuropsychological exams to detect the onset of brain damage and/or cognitive deficits.[2]

## II. DISCUSSION

To maintain a class action, Plaintiffs must satisfy the prerequisites set forth in Federal Rule of Civil Procedure 23(a). Rule 23(a) provides that a member of a class may sue as a representative party on behalf of the class when: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiffs must also satisfy one of the requirements of Rule 23(b). Here, Plaintiffs seek class certification under Rule 23(b)(2). Rule 23(b)(2) provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding

_____

[2] Classes 2 and 3 are directed against the CHA only for the time period prior to December, 1995 when Quadel/CHAC assumed control of the Section 8 Program and against Quadel/CHAC and the CHA for the period after December, 1995.

declaratory relief with respect to the class as whole."

Defendants raise four main arguments in opposition to class certification: (1) the class definitions are impermissibly indefinite and vague; (2) this is a mass tort action which is not amenable to class action treatment; (3) Plaintiffs fail to meet the requirements of Rule 23(a); and (4) the required elements of Rule 23(b)(2) have not been satisfied. The Court will address each argument in turn.

## A.     Definiteness Requirement

Rule 23(a) contains an implicit definiteness requirement. <u>Alliance to End Repression v. Rochford</u>, 565 F.2d 975, 977 (7th Cir. 1977). "Before a class can be certified, the party seeking certification must show that an identifiable class exists. An identifiable class exists if its members can be ascertained by reference to objective criteria. A class description is insufficient, however, if membership is contingent on the prospective member's state of mind." <u>Gomez v. Illinois State Bd. of Educ.</u>, 117 F.R.D. 394, 397 (N.D. Ill. 1987). Plaintiffs' three sub-classes are based on objective criteria such as age, residence in Section 8 housing in Chicago to which lead-based paint housing quality standards apply, and elevated blood-lead levels in excess of 10mcg/dl. The definiteness requirement is satisfied as to the three sub-classes. [3]

The CHA maintains that Plaintiffs' sub-class 2 and 3 definitions are impermissibly vague because they fail to account for the dates on which the LBPPPA and the implementing regulations

---

[3] The CHA correctly points out that the putative class detailed in Plaintiffs' Third Amended Complaint differs from the three sub-classes outlined in Plaintiffs' pleadings in support of their class certification motion. In this Report and Recommendation, the Court has considered the three sub-class definitions proposed in Plaintiffs' Reply Brief Appendix. Plaintiffs are granted leave to amend their complaint to comport with the sub-class definitions.

were enacted. There have been three versions of the lead-based paint Housing Quality Standards regulations at issue in the present case. The initial regulations were enacted in 1976 and amended in 1987 and October 1995. Plaintiffs currently limit the scope of their sub-classes to the period of 1987 through the present. Thus, this action presently involves the second set and third set of Housing Quality Standards regulations.

Plaintiffs explain that the primary differences between the second and third set of regulations are: (1) changing the definition of elevated blood-lead level from 25 ug/dl to a single result of 20 ug/dl, or consecutive results of 15-19 ug/dl three months apart and (2) changing the qualifying age of the protected class of children from 7 years old to 6 years old. Plaintiffs represent that no substantive changes were made to the inspection and follow-up requirements that are at issue in the present case.[4] Plaintiffs' sub-classes address these minor differences between the regulations. Sub-classes 2 and 3 take into account the change of the qualifying age in 1995. Moreover, Plaintiffs seek only to assert sub-classes 2 and 3 against Defendants for violation of the second amendment pre-October 1995 and for the current regulation post-October 1995. Thus, any liability will be determined solely by the regulations in effect during the relevant time period.

CHA further contends that the sub-class definitions fail to account for the applicable statute of limitations and fail "to offer a formula for determining class membership in accordance with the statute of limitations." CHA's argument is without merit and provides no basis for denying class

_____

[4] The CHA complains that Plaintiffs can not "lump together" all minors who have ever lived in CHA Section 8 housing when the CHA's required conduct changed with each amendment of the HQS regulations and Plaintiffs have failed to explain how these "qualitative" differences among the sub-classes will be handled. The Court rejects the CHA's argument as a ground for denying class certification because the CHA fails to specifically explain the substantive differences in its required conduct under each amendment.

certification. No statute of limitations issue exists with respect to sub-class 1 because it seeks Defendants' current and future compliance with the applicable regulations. Sub-classes 2 and 3 do not presently implicate conduct prior to 1987, when the lead-based paint regulations were first amended. In 1987, the regulations then required compliance with the lead-based paint HQS for children under the age of seven. Children age six years old in 1987 would be seventeen when the complaint in this case was filed in October, 1998 and under the age of majority. As the CHA acknowledges, the statute of limitations does not begin to run until the minor Plaintiffs reach the age of majority. Thus, no statute of limitations issues exist which would preclude class certification.

CHA also claims that sub-class 3 fails to meet the definiteness requirement because Plaintiffs have not proven that CHA is the source of lead for any child having an elevated BLL and that Plaintiffs' expert, Dr. Rosen, ignores the fact that diseases such as cancer, kidney disease, hypertension and peripheral neuropathy have other causes besides lead poisoning. CHA's arguments address the merits of the claims and are more appropriately considered at summary judgment or trial. Moreover, the CHA has not provided any case authority indicating that Plaintiffs must make such causation showings at the class certification stage.

**B.    Mass Tort Actions**

Defendants maintain that this case involves a mass tort claim and in large part a personal injury claim which is not amendable to class action treatment. Courts have noted that mass tort actions are generally not suited for class treatment. Ortiz v. Fibreboard Corp., 119 S.Ct. 2295, 2313 n.20. (1999) (quoting Fed. R. Civ. P. 23(b)(3) advisory committee notes, "a mass accident resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions not only of damages, but of liability and defenses of liability

-10-

would be present, affecting the individuals in different ways."). However, as the Supreme Court has recognized, Rule 23 "does not categorically exclude mass tort cases from class certification." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997). "Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement [of subdivision (b)(3)]." Id.

The three cases relied on by Defendants are distinguishable and do not preclude class certification here. Both In re Agent Orange Product Liability Litigation, 818 F.2d 145 (2nd Cir. 1987), and Commonwealth of Puerto Rico v. The M/V Emily S, 158 F.R.D. 9 (D.P.R. 1994), involved actions for personal injury damages and sought class certification under Rule 23(b)(3), which requires that common questions of law or fact predominate over issues affecting individual members of the class. In sharp contrast, Plaintiffs are not seeking damages on behalf of the class nor do they seek class certification under Rule 23(b)(3). Thus, unlike the concerns present in class action personal injury suits, the sub-classes here will not degenerate into individualized damage determinations.

Moreover, in In the matter of Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir. 1995), cert. denied, 51 U.S. 867 (1995), the Seventh Circuit issued a writ of mandamus decertifying a class action on behalf of hemophiliacs exposed to the HIV virus as a consequence of using the defendants' blood solids. Defendants correctly point out that the Seventh Circuit recognized that "[m]ost federal courts . . . refuse to permit the use of the class-action device in mass tort cases, even asbestos cases. Those courts that have permitted it have been criticized . . . . " Id. at 1304. The district court had certified the class only as to certain issues and proposed the following procedure:

> [H]e did not envisage the entry of a final judgment but rather the rendition by a jury of a special verdict that would answer a number of questions bearing, perhaps decisively, on whether the defendants are negligent under either of the theories sketched above. If the special verdict found no negligence under either theory, that presumably would be the end of all the cases unless other theories of liability proved viable. If the special verdict found negligence, individual members of the class would then file individual tort suits in state and federal district courts around the nation and would use the special verdict, in conjunction with the doctrine of collateral estoppel, to block relitigation of the issue of negligence.

Id. 1297. The Seventh Circuit described the district court's procedure for managing the adjudication of this mass tort as "innovative" but as exceeding the "permissible bounds of discretion in the management of federal litigation." Id. at 1297. The Seventh Circuit issued the writ of mandamus because of "the looming infringement of Seventh amendment rights" and "the undue and unnecessary risk of a monumental industry-busting error in entrusting the determination of potential multi-billion dollar liabilities to a single jury when the results of the previous cases indicate that the defendants' liability is doubtful at best and the questionable constitutionality of trying a diversity case under a legal standard in force in no state." Id.

The Rhone-Poulenc case is inapposite. None of the concerns identified by the court in Rhone-Poulenc (the Seventh Amendment issues, prior defense verdicts, and varying state laws) are present in the instant case where the sub-classes seek only declaratory and injunctive relief to be determined by the trial court, no prior verdicts exist, and all potential members of the class resided in the same state at the time of the events giving rise to the action.

## C.   Rule 23(a)

### 1.   Numerosity and Impracticability

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." "[P]laintiffs are not required to specify the exact number of persons in the class, but

cannot rely on conclusory allegations that joinder is impractical or on speculation as to the size of the class in order to prove numerosity." Marcial v. Coronet Ins. Co., 880 F.2d 954, 957 (7th Cir. 1989).

Plaintiffs allege that currently approximately 20,000 families live in Section 8 properties administered by Defendants. Third Am. Cmplt. ¶ 22. Quadel/CHAC contend that Plaintiffs' approximation is speculation but offer no evidence in support of a lesser number. Plaintiffs, relying on computer records produced by Quadel/CHAC during discovery, state that since 1996, there have been approximately 8,450 Section 8 families that had a least one child (and in many instances two or more children) under the age of six at the time they moved into their Section 8 residence. Plaintiffs reasonably estimate that since 1996, at least 10,000 children under the age of six have resided in Section 8 housing managed by Defendants. This figure does not include former Section 8 participants with children under the age of six or applicant families not yet residing in Section 8 housing.

Plaintiffs have also presented public information showing the large number of CHA residents. According to HUD, as of September 1996, the CHA had contracts under the Section 8 program with 15,696 units. Plaintiffs further note that according to the CHA's internet web site, 26,044 units are approved for Section 8 subsidy payments with 61,102 residents living in those units. Plaintiffs reasonably believe that a significant percentage live in pre-1978 housing. See Plaintiffs' Reply App., Ex. E (CDOH Lead Poisoning Prevention Program stating "[a]pproximately 59% of Chicago's housing stock was build prior to 1950 and much of this housing stock is in poor condition."). Moreover, in or around August 1997, the CHA placed an additional 35,000 persons on the Section 8 waiting list and notified these individuals that they would receive housing assistance

-13-

within three years.

CHA does not contend that sub-class 2, consisting of all past or present tenants of Section 8 hosing with minor children under the age of 6 or 7 in Chicago, fails to met the numerosity requirements. Approximately 8,450 Section 8 participating families with children under the age of six at the time they moved into their Section 8 residence since 1996 satisfies the numerosity requirement with respect to sub-class 2.

CHA asserts that Plaintiffs have failed to met the numerosity requirement for sub-classes 1 and 3. With respect to sub-class 1, the number of current residents with children under the age of six to which lead-based paint HQS apply plus future similarly situated residents satisfies the numerosity requirement. The numerosity requirement is easily satisfied with respect to sub-class 1 because it seeks injunctive relief against conduct that is likely to cause future injuries. Inclusion of future class members makes joinder impracticable regardless of the number of persons already injured. See Gomez, 117 F.R.D. at 399; 1 Newberg on Class Actions, § 3.07 (collecting cases). Henry Horner Mothers Guild v. The Chicago Housing Authority, 1991 WL 246539, *1-2 (N.D. Ill. 1991) (holding plaintiffs' allegation of 925 leaseholders and 35,000 applicants on the waiting list for public housing  satisfied numerosity requirement).

With respect to sub-class 3, Plaintiffs have presented evidence published by the Illinois Department of Public Health showing that between 1993 and 1997, the percentage of children age six and under in Chicago who had elevated blood-lead levels (EBLs) greater than 15 mcg/dl was between 11.05% and 12.16%. Plaintiffs reasonably estimate that the number of children age six and under living in Section 8 housing for the past ten years exceeds 20,000. Based on the Illinois Department of Public Health statistics, at least 2,200 children would have EBLs in excess of 15

mcg/dl and thus should be tested to detect the onset of latent disease associated with lead poisoning. Sub-class 3 satisfies the numerosity requirement.

Defendants' heavy reliance on <u>Marcial v. Coronet Ins. Co.</u>, 880 F.2d 954, 957 (7th Cir. 1989), is misplaced. In <u>Marcial</u>, plaintiffs alleged that the defendant insurance company denied insureds' claims solely because they had refused to take or failed a lie detector test. The Seventh Circuit held that the district court properly denied class certification in part because the record did not support plaintiffs' assertion that all policyholders were told they had to take the polygraph examination to receive payment or that every person who failed had their claim denied solely on the basis of the test results. Thus, the court concluded that plaintiffs had only speculated as to the number of persons who had legitimate claims against defendant. Here, Plaintiffs' assertion of numerosity is supported by more than speculation. Plaintiffs have presented evidence concerning the number of current and future Section 8 families, the percentage of children age six and under in Chicago with EBLs greater than 15 mcg/dl between 1993 and 1997, and Defendants' failure to comply with lead-based paint statues and regulations with respect to the named Plaintiffs and on a widespread basis.

Defendants also inappropriately rely on the adult Plaintiffs' deposition testimony to show that numerosity is lacking. For example, CHA and Quadel/CHAC point out that the adult named Plaintiffs testified that they did not know of any minor children with elevated blood lead levels other than the named Plaintiffs. Thus, Defendants argue that Plaintiffs' assertion that sub-classes 1 and 3 are so numerous that joinder is impracticable is conjecture. The Court rejects Defendants' argument because they fail to cite any authority holding that the named Plaintiffs must have personal knowledge of other class members to satisfy numerosity.

Finally, the CHA's assertion that families with minor children who suffered an injury relating to the ingestion of lead-based paint can readily obtain counsel to prosecute a person injury case is misplaced. Even if a correct assumption, this case does not seek damages for personal injury on behalf of the class. Thus, the ability of the Section 8 families to retain attorneys on a contingency fee basis to pursue personal injury actions is irrelevant to the numerosity requirement.

## 2. Commonality

Rule 23(a)(2) requires a showing that the class has common questions of law or fact. "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." Rosario v. Livaditis 963 F.2d 1013, 1018 (7th Cir. 1992), cert. denied, 506 U.S. 1051 (1993). A common nucleus of operative fact is typically found were "defendants have engaged in standardized conduct towards members of the proposed class . . . ." Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998). Some variation among the claims of the individual class members does not defeat commonality. Rosario, 963 F.2d at 1017. "There need only be a single issue [of law or fact] common to all members of the class." Gomez, 117 F.R.D. at 399 (quoting Edmondson v. Simon, 86 F.R.D. 375, 380 (N.D. Ill. 1980)).

Plaintiffs list the following questions of law and fact which are common to the sub-classes:

1. Whether Defendants failed to inspect for defective paint surfaces in Section 8 Program properties, notify the owners of the Section 8 properties of the defective paint surfaces from which lead paint must be removed, require the owners of the Section 8 properties to cover or remove defective paint surfaces within 30 days, verify that the owners of the Section 8 properties have performed the required abatement prior to providing assistance under the Section 8 Program, and take prompt and vigorous action in the event that the owners do not comply with removal of lead-based paint;

2.  Whether, upon learning of a child with an EBL, Defendants failed to arrange for lead inspection of the chewable surfaces of the Section 8 properties by x-ray florescence or other method approved by the United States Department of Housing and Urban Development, notify the owners of the Section 8 properties of the chewable surfaces from which lead paint must be removed or on which lead paint must be covered, require the owners of the Section 8 properties to cover or remove chewable paint surfaces which are found to contain lead equal to or greater than 1.0mg/cm2 within 30 days, verify that the owners of the Section 8 properties have performed the required abatement prior to providing assistance under the Section 8 Program, and take prompt and vigorous action in the event the owners do no comply with removal of lead-based paint;

3.  Whether Defendants failed to comply with its data and record keeping responsibilities by failing to attempt to obtain annually from local health agencies the names and addresses of children with identified EBLs, annually match this information with the names and addresses of participants in the Section 8 Program, determine whether local health officials have tested the unit for lead-based paint when matches are found, require the owners to treat the lead-based paint where lead-based paint exists, and issue to the families a certificate or voucher to move upon owners' noncompliance with lead paint removal techniques;

4.  Whether Defendants failed to notify prospective Section 8 tenants that the properties were constructed prior to 1978, that the properties may contain lead-based paint, of the hazards of lead-based paint, of the symptoms and treatment of lead-based paint poisoning, and of the precautions to be taken to avoid lead-based paint poisoning, including maintenance and removal techniques for eliminating such hazards;

5.  Whether Defendants are liable under an implied right of action theory for violations and/or non-compliance with the applicable provisions of USHA and LBPPPA;

6.  Whether Defendants are liable under 42 U.S.C. § 1983 for violations and/or non-compliance with USHA and or LBPPPA and their regulations;

7.  Whether Defendants are liable to Plaintiffs for breach of its ACC with HUD;

8.  Whether Quadel/CHAC are liable to Plaintiffs for breach of the contract with CHA;

9.  Whether the members of the classes are entitled to declaratory and final injunctive relief to effectuate compliance with the provisions of the USHA and LBPPPA and their regulations;

10. Whether children should be medically monitored to detect lead poisoning and its insidious latent effects;

11. Whether the members of the class are entitled to the establishment, by Defendants, of a court-supervised fund administered by a court-appointed trustee for medical monitoring of: lead poisoning, the development of latent disease and impairment caused by lead poisoning, and/or any other medically necessary tests to promote early detection.

The CHA contends that commonality does not exist here because each Section 8 residence is subject to differing maintenance standards, each apartment has its own unique characteristics, a significant number of the residences were built or remodeled after 1978, each individual inspection must be reviewed to determine compliance, children at risk for lead exposure may have resided at a number of different locations, each class member will have had potential exposure to lead from sources other than paint, each child's medical, social, and family history must be examined to determine whether they caused or contributed to behavioral and/or cognitive deficits in children exposed to lead, the duration and magnitude of each child's lead exposure will impact the nature and extent of behavioral and/or cognitive deficits experienced, and causation must be determined on an individual basis.[5]

_____

[5] Quadel/CHAC's Memorandum in Opposition to Class Certification does not contest commonality.

In the factually similar case of <u>Hurt v. Philadelphia Housing Authority</u>, 151 F.R.D. 555

(E.D.Pa. 1993), residents of public housing alleged, among other things, that the defendant housing

authority violated the USHA, the LBPPPA, and several state laws by failing to eliminate the danger

of lead-based paint in housing owned and operated by the housing authority. The <u>Hurt</u> court rejected

the defendant housing authority's argument that common questions did not predominate because

"plaintiffs may have differing levels of exposure to lead and individual determinations will be

required as to whether PHA failed to comply with local law or exercise due care in specific

instances." <u>Hurt</u>, 151 F.R.D. at 559.

Likewise, in <u>Valez v. Kemp</u>, 1993 WL 45989 (E.D.Pa. 1993), plaintiffs alleged that

defendants failed to maintain public housing developments. The district court held that the

commonality requirement was met:

> Here, plaintiffs allege that the defendants have allowed the CHA developments to
> deteriorate and remain partially vacant so that the tenants' rights to decent, safe, and
> affordable housing under the Housing Act have been violated. Plaintiffs also argue
> that defendants' conduct violates their civil rights and denies them benefits as the
> intended beneficiaries of the Annual Contributions Contract.
>
> Plaintiffs have alleged a single source of harm affecting all class members adversely.
> Some members of the class may have suffered more than others from defendants'
> actions and only part of the class has allegedly suffered directly from defendants'
> putative racial discrimination but these differences among plaintiffs do not defeat
> certification. The points of fact and law common to all plaintiffs predominate in
> satisfaction of the requirements of Rule 23.

<u>Id.</u> at * 3. <u>See also</u> <u>German v. Federal Home Loan Mortgage Corp.</u>, 885 F. Supp. 537, 554

(S.D.N.Y. 1995) (holding commonality requirement satisfied where common questions of law

existed concerning whether defendants failed to abide by federal laws' requirements concerning the

hazards of lead paint).

Similarly, CHA's arguments do not defeat commonality. Plaintiffs allege a policy, custom and practice by Defendants of failing to comply with the lead-based paint standards. Plaintiffs do not seek class-wide personal injury relief. Thus, the issues of whether the class members suffered personal injury and whether such personal injury was caused by lead poisoning is not relevant. The commonality requirement has been met in the instant case because the claims of the named Plaintiffs and the proposed class members arise from the same practice of Defendants, namely their alleged failure to comply with the applicable provisions of the USHA and the LBPPPA. The existence of individual issues does not preclude a finding of commonality because it is not necessary for common issues to predominate over individual issues in a class certified under Rule 23(b)(2). Amchem Products, Inc., 521 U.S. at 623-624 (holding that "the predominance criterion is far more demanding" than Rule 23(a)'s commonality requirement.). If individual issues arise which appear inappropriate for class treatment, the Court can address those issues when necessary. German, 885 F. Supp. at 554 (stating "[f]urther proceedings may reveal that some of the questions raised by the plaintiffs require individual inquiries, inappropriate for a class action, which can be resolved either by further defining the scope of the class action, by designating further sub-classes, or by decertifying the class if that were to become necessary."); Fed. R. Civ. P. 23(c)(1) and Advisory Committee Notes to 1966 Amendment (indicating that certification of a class may be revoked or altered before the decision on the merits "if, upon fuller development of the facts, the original determination appears unsound.").[6]

_____

[6] Reilly v. Gould, Inc., 965 F. Supp. 588 (M.D. Pa. 1997), relied on by CHA, is distinguishable. In Reilly, present and former members of a Pennsylvanian town brought a lawsuit against the owner and operator of a battery crushing and lead processing plant. The plant site was contaminated with lead and other hazardous materials and had contaminated the surrounding air and

### 3.    Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class. The question of typicality is "closely related" to the question of commonality. Rosario, 963 F.2d at 1018. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir. 1983) (quoting H. Newberg, Class Actions § 1115(b) at 185 (1977)). Typicality may be found even where "there are factual distinctions between the claims of the named plaintiffs and those of other class members." Id. "Instead, we look to the defendant's conduct and the plaintiff's legal theory to satisfy Rule 23(a)(3)." Rosario, 963 F.2d at 1018; Wagner v. Nutrasweet Co., 95 F.3d 527, 534 (7th Cir. 1996) (indicating typicality "should be determined with reference to the [defendants'] actions, not with respect to particularized defenses it might have against certain class members.").

Plaintiffs' claims are typical of the class. Plaintiffs are members of the classes they seek to represent and their claims are the same as the claims of the class. Ieshia Hall and Brandon Greenlee seek to represent sub-class 1. Amanda Elliott, Edward Elliott, David Boss, and Cecile Hall will act as representatives for sub-classes 2 and 3 against CHA for the period prior to December 1995. Ieshia

---

ground water, as well as the soil of the neighboring residences. Plaintiffs sought injunctive relief, including a medical monitoring fund, damages for personal injury, residential property damage, and class certification. The Reilly court found commonality lacking because "whether and to what extent the emissions are said to have affected each class member is not common to all involved." Id. at 598. The Reilly court did not discuss the medical monitoring claims when determining commonality. Unlike Reilly, this case does not involve a claim for personal injury and thus the extent of the lead's affect on each class member does not destroy the commonality of the issues of fact and law identified.

Hall and Brandon Greenlee will act as representatives for sub-class 2 against Quadel/CHAC and CHA for the period of time since December 1995. Brandon Greenlee seeks to represent sub-class 3 against Quadel/CHAC and CHA for the period of time since December 1995.

Plaintiffs' claims arise from the same course of conduct by Defendants that gives rise to the claims of the class members, i.e. Defendants' failure to comply with the lead-based paint HQS that apply to Section 8 participants. Plaintiffs' claims are also based on the same legal theories as the class members' claims. Plaintiffs and the proposed class members both seek declaratory and injunctive relief requiring Defendants to comply with the provisions of the federal statutes and regulations governing the defective paint surface requirements of the HQS for Section 8 housing units. See German, 885 F. Supp. at 554-555; Hurt, 151 F.R.D. at 560 (holding typicality requirement satisfied where plaintiffs were residents of public housing authority who allegedly had been injured by housing authority's violation of federal lead paint statutes and defendants' subsequent failure to abate the danger and plaintiffs sought to represent other residents of public housing authority facing similar dangers); Velez, 1993 WL 45989 at *3 (typicality satisfied for class of current public housing tenants who were allegedly injured by the same pattern of conduct and complaints of the class representatives and class members were founded on the same legal theories).

CHA contends that given the broad range of Plaintiffs' exposure or lack or exposure to lead-based paint, potential causes of exposure, and injuries or lack of injuries, it is impossible for Plaintiffs to be typical of the class as a whole. CHA's argument misses the point. The focus of the typicality requirement is on Defendants' conduct. Thus, individual variations among Plaintiffs and class members concerning magnitude of exposure and extent of injuries does not defeat typicality, especially here where damages for personal injuries are not sought. Baby Neal v. Casey, 43 F.3d

-22-

48, 58 (3rd Cir. 1994) (noting that "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of varying factual patterns underlying individual claims. Actions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold.").[7]

### 4. Adequacy of Representation

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." Rosario, 963 F.2d at 1018. The adequacy of representation determination consists of two parts: (1) "the adequacy of the named plaintiffs' counsel;" and (2) 'the adequacy of representation provided in protecting the different, separate, and distinct interest" of the class members. Retired Chicago Police Ass'n, 7 F.3d at 598.

---

[7] Quadel/CHAC argue that Faye Elliott's claims on behalf of her children and Cecile Hall's claims are not typical of the class claims because the alleged inspection failures occurred prior to Quadel/CHAC's involvement in December 1995. Thus, Quadel/CHAC maintain that the "class members' claims do not arise from the alleged same course of conduct to satisfy the typicality requirement under Rule 23(a)(3) because prior to December 1995 the CHA inspected Section 8 apartments and after December 1995 Quadel/CHAC inspected the apartments." Quadel/CHAC's argument is without merit. Only Ieshia Hall and Brandon Greenlee seek to represent the three sub-classes against Quadel/CHAC for the period after December 1995. Their claims are typical of the class members' claims against Quadel/CHAC for the same time period. Rule 23(a)(3) does not require that all named representatives state claims against all named Defendants. Rather, Plaintiffs need only show that the representatives bringing claims against Quadel/CHAC have claims typical of the putative class claims against Quadel/CHAC. The Court also rejects Quadel/CHAC's argument that typicality is absent because the USHA was amended in 1998 and thus, the named representatives are not relying on the same legal theory as the class members. Quadel/CHAC define typicality too narrowly. The underlying legal theory is the same, i.e. Defendants failed to comply with the lead-based paint HQS that apply Section 8 participants before and after the 1998 amendment.

### a.   Adequacy of Counsel

Plaintiffs' counsel has submitted affidavits detailing their relevant prior experience. Class counsel has experience in litigating class actions, including three other class actions seeking to compel housing authorities to comply with federal lead-based paint regulations, and in personal injury damages claims involving lead-based paint poisoning. Defendants do not challenge the adequacy of class counsel's qualifications and experience. The high quality of the briefs submitted by Plaintiffs' counsel in support of class certification also confirms counsel's ability to adequately and vigorously conduct the proposed litigation. For these reasons, the Court finds that the first part of the adequacy requirement is met.

### b.   Adequacy of Class Representatives

"[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." Amchem Prods., Inc., 521 U.S. at 625-626 (quoting East Tex. Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395 (1977)). The CHA and Quadel/CHAC make the following arguments concerning adequacy: (1) the Elliott children and Cecile Hall are over the age of six and not entitled to compliance with the lead-based paint HQS which is the relief sought by sub-class 1; (2) the Elliott children are pursuing individual claims for damages and are "no doubt" predominantly interested in pursuing their own claims for compensatory damages; (3) members of sub-class 2 who have not been exposed to lead and suffer no ill effects are likely to be disinterested in the case; (4) members of sub-class 3 who have elevated blood-lead levels and experience symptoms of lead poisoning may wish to opt out of the class and pursue individual claims for damages; and (5) the Elliott children are too old to benefit from a medical monitoring program.

Defendants' arguments are without merit. First, the fact that the Elliott children and Cecile Hall are over age six is not dispositive as they are not offered as class representatives of sub-class 1. Ieshia Hall (DOB 5/6/94) and Brandon Greenlee (DOB 10/2/97) are the minor Plaintiffs who will represent sub-class 1. Quadel/CHAC have not contested the adequacy of Ieshia Hall and Brandon Greenlee to act as representatives for each class against Quadel/CHAC. Moreover, the fact that the Elliott children are also pursuing damages claims does not make them inadequate class representatives for sub-classes 2 and 3. German, 885 F. Supp. at 555 (holding "the fact that the named plaintiffs are seeking damages on their own behalf does not make them inappropriate class representatives."). Although Defendants deposed Faye Elliott, they fail to present any evidence showing that the Elliotts will not vigorously pursue the case for children exposed to lead-based paint in their Section 8 homes prior to Quadel/CHAC's involvement because they seek damages.

The Court also rejects the CHA's contention that members of sub-class 1 who have not been exposed to lead and suffer no ill effects will likely be disinterested in the case. CHA fails to cite any authority indicating that potential disinterested certain class members affects the named Plaintiffs' ability to adequately represent the class. CHA has not provided any credible basis for finding that the proposed sub-class 1 representatives (Ieshia Hall and Brandon Greenlee) will not be interested in pursuing Defendants' compliance with lead-based paint HQS regulations.

The CHA's argument that members of sub-class 3 with elevated blood levels and symptoms of lead poisoning may wish to opt out of the class and pursue their own individual claims for damages is frivolous. Since Plaintiffs are not pursuing class damages, no class member needs to opt out to pursue such a claim. Finally, CHA fails to provide any evidentiary support for its claim that the Elliott children (Edward, age 15; Davis, age 13; and Amanda, age 12) are too old to benefit from

-25-

a medical monitoring program. Dr. Rosen's affidavit indicates that prior to the onset of some of the latent diseases caused by lead exposure, there is a substantial latency period of several months to many years following childhood exposure to lead. Plaintiffs' Reply Appendix, Ex. B. According to Dr. Rosen, lead continues to inhabit the body and organs for a "very long period of time" after exposures. Id.

**D. Rule 23(b)(2)**

Under Rule 23(b)(2), an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief with respect to the class as a whole." According to the 1966 Advisory Committee notes, subdivision (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Defendants do not argue that sub-class 1, which seeks Defendants' compliance with the governing regulations, is not maintainable as a Rule 23(b)(2) class. Sub-class 1 meets the requisites of Rule 23(b)(2). See Hurt, 151 F.R.D. at 560-61; Baby Neal, 43 F.3d at 64.[8]

With respect to sub-classes 2 and 3, Defendants contend that Rule 23(b)(2) has not been satisfied because Plaintiffs primarily seek a medical monitoring fund which is "simply a disguised request for money damages." A split in the case law exists concerning a whether claim seeking a medical monitoring fund may properly be characterized as seeking injunctive relief. Cases holding in the affirmative include German, 885 F. Supp at 560; Gibbs v. E.I. DuPont De Nemours & Co., Inc., 876 F. Supp. 475, 481 (W.D.N.Y. 1995) (holding "[a] court- administered fund which goes

_____

[8] The Court finds unpersuasive CHA's concerns that a Rule 23(b)(2) class will improperly bind the class members because money damages are not sought here.

beyond payment of costs of monitoring an individual plaintiff's health to establish pooled resources for the early detection and advances in treatment of the disease is injunctive in nature rather than 'predominately money damages' and therefore is properly certified under Rule 23(b)(2)."); Day v. NLO, 144 F.R.D. 330, 336 (S.D. Ohio 1992), vacated on other grounds, 5 F.3d 154, 159-160 (6th Cir. 1993); and Yslava v. Hughes Aircraft Co., 845 F. Supp. 705, 713 (D. Ariz. 1993).[9] Cases holding to the contrary include Building & Const. Dept. v. Rockwell Int'l Corp., 7 F.3d 1487, 1492 (10th Cir. 1991) (stating that action seeking the establishment of a court supervised fund to finance a program of medical monitoring for workers exposed to hazardous substances was "essentially a suit for damages against private defendants as a remedy for past misconduct."); Cook v. Rockwell Int'l Corp., 181 F.R.D. 473, 478-480 (D.Colo. 1998); and Thomas v. FAG Bearings Corp., Inc., 846 F. Supp. 1400, 1404 (W.D. Mo. 1994). The Seventh Circuit has not addressed this issue, and the question is not sufficiently settled to justify denying class certification on this ground.

Here, Defendants, by allegedly refusing to comply with federal statutes and regulations regarding lead paint hazards, have acted on grounds generally applicable to the class. The Court holds that a court-supervised medical monitoring program through which class members will receive periodic examinations may be properly characterized as seeking injunctive relief and thus, appropriate for certification under Rule 23(b)(2). A medical monitoring fund would constitute relief

---

[9] The CHA's attempt to distinguish these cases on the ground that the medical monitoring sub-classes here do not include other mandatory conduct beyond contributing to a screening program such as data compilation and analysis is unavailing. Dr. Rosen's affidavit explicitly states: "There are other aspects to this medical monitoring program, as well, including but not limited to epidemiological data collection and study (a generally-accepted longitudinal tracking system and modeling protocol) and continued surveillance, which are important aspects of any competent medical surveillance program and serve the interests of early detection of latent disease." Rosen's Aff. ¶ 13.

generally applicable to sub-classes 2 and 3.[10]

## III. **CONCLUSION**

For the reasons set forth above, Plaintiffs' Amended Motion for Class Certification should

be GRANTED. Any objections to this Report and Recommendation must be filed with Clerk of the

Court within ten (10) days of receipt of this notice. <u>See</u> Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1).

Failure to object constitutes a waiver of the right to appeal. <u>Lorentzen v. Anderson Pest Control</u>, 64

F.3d 327, 330 (7th Cir. 1995).

**E N T E R :**

*Nan R. Nolan*

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated:** Feb 25, 2000

---

[10] Quadel/CHAC spend pages of their Opposition detailing certain changes Congress made to the USHA in 1998. Quadel/CHAC conclude, without any explanation, that the 1998 amendment to the USHA is "relevant" to Plaintiffs' request for class certification and that "the Congressional amendments establish that plaintiffs are not entitled to class certification." Quadel/CHAC's Opposition, pp. 4-6, 19. If the 1998 amendments changed Quadel/CHAC's obligations under the Act in relevant areas, the standards of conduct provided for in the amendments will be used to evaluate Quadel/CHAC's conduct for the period of time since the amendment when the Court evaluates the merits of the case. Quadel/CHAC has not made a sufficient showing that the 1998 amendment is relevant to any determination at this stage of the proceedings.